## CIRCUIT COURT OF THE CITY OF RICHMOND

Commonwealth of Virginia

v.

"The Devil in Miss Jones"

November 13, 1973

By JUDGE JAMES M. LUMPKIN

Pursuant to Virginia Code Sections 18.1-236.3 and 18.1-236.4, the Commonwealth's Attorney of the City of Richmond filed a petition alleging that a movie titled "The Devil in Miss Jones" was obscene. After viewing the film as required under sub-section (3), the court entered a show-cause order convening interested parties to show cause, on September 12, 1973, why the film should not be adjudicated obscene. The petition had been filed July 27, 1973, and the order entered three days thereafter. Also, notice was given that the court would determine on August 3, 1973, whether a temporary restraining order against further commercial exhibition would be entered, as provided in sub-section (5). The temporary restraining order was entered on August 3, 1973, subsequent to argument of counsel.

On or about September 12, 1973, respondent moved for a continuance of the hearing on the merits to October 1, 1973, in order to file memoranda of law. This motion was granted, and by consent the restraining order was extended to November 14, 1973, or until the further order of this court.

The film had been showing locally approximately nine days at the Biograph Theatre in Richmond.

For organizational purposes this opinion will first deal with the motions, then the merits.

## The Motions

Numerous motions, both orally and in writing, have been offered by the respondent. All have been ruled upon from the bench; however, some effort ought to be made now, considering Section 18.1-236.3(8), to reduce the rulings to writing.

1. Trial by jury. Section 18.1-236.3 makes no provision for jury trials. The proceeding is civil, not criminal. The Virginia Supreme Court, in *Alexander v. Commonwealth*, 212 Va. 554 (1972), met this argument head-on and found it without merit. The United States Supreme Court, on certiorari, agreed with our highest court, on June 25, 1973.

2. Section 18.1-236.3(5) is violative of procedural due process in its four-day notice provision. This provision is not unlike other temporary injunction proceedings pending a full and adequate hearing. Further, counsel for respondent on August 3, 1973, ably argued, among other matters, constitutionality of Virginia obscenity laws, was afforded the opportunity to present witnesses, and obviously was able to arrange his calendar in order to be present in court that day. Respondent, through counsel, in short, appeared prepared, thoroughly versed in applicable law, and excellent in argument on August 3, 1973.

3. The presiding Judge should have disqualified himself, he having issued the notice regarding the temporary restraining order and had determined probable cause the movie was obscene. The thrust of this argument seems to be that the Judge would thereby be complainant and fact-finder. The Virginia General Assembly has required disqualification in wire-tapping cases. Section 19.1-89.8(8)(b) requires that the Judge who receives a wire-tap application shall be disqualified from presiding at any trial connected in any manner with the tap. Significantly, no such language is found in the obscenity statutes; indeed, it appears the instant proceeding followed precisely the mandate of Section 18.1-236.3. Sub-section (3) requires the Judge who views the film to issue the show-cause order, upon probable cause, and likewise impliedly requires that he issue notice regarding the temporary

restraining order. Nothing in the language of this section suggests disqualification.

4. Virginia obscenity statutes are unconstitutional in light of *Miller* v. *California*, 413 U.S. 15, and other obscenity decisions of the United States Supreme Court handed down on June 21, 1973, and thereafter. This is the "meat" of respondent's argument on motions. Any attempt here to detail the history of obscenity rulings by the United States Supreme Court would be uselessly time-consuming and, most likely, inadequate. Suffice it to say *Roth* v. *United States*, 354 U.S. 476 (1957), and *A Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Massachusetts*, 383 U.S. 413 (1966), represented the guiding lights in state obscenity cases prior to June 21, 1973.

The test of obscenity in *Roth*, 354 U.S. at 489, was "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Nine years later in *Memoirs* a mere plurality of the United States Supreme Court amplified *Roth*:

> . . . three elements must coalesce it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.

Then came *Miller*, and for the first time in sixteen years, the United States Supreme Court spoke through a majority in a major obscenity decision, applying the following test:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically

defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

In *Miller*, the court reviewed First Amendment guaranties of speech, of ideas though unorthodox, controversial, or even ideas hateful to the prevailing climate of opinion, then re-affirmed that obscenity is not within the area of constitutionally protected speech or press; further, the court quoted its judgment of *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942), that the prevention and punishment of obscenity have " . . . *never been thought to raise any constitutional problem.*"

The *Miller* opinion acknowledged:

. . . inherent dangers of undertaking to regulate any form of expression. State statutes designed to regulate obscene materials must be carefully limited. As a result, we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.

Thus, the *Roth* rule has been amplified and clarified, and the nearly impossible "utterly without redeeming social value" test of *Memoirs* is rejected. States may thereby prescribe obscenity standards, provided the sexual conduct is specifically defined by statute or by authoritative construction. The phrase " . . . as . . . authoritatively construed . . . " appears obviously, for our purposes, to mean by the Virginia Supreme Court.

In the four months since *Miller*, no obscenity decision has been made by the Virginia Supreme Court. However, three such cases were ruled upon within the four years immediately preceding. *House* v. *Commonwealth*, 210 Va. 121 (1969); *Alexander* v. *Commonwealth*, 212 Va. 554 (1972); and *Price* v. *Commonwealth*, 213 Va. 113 (1972). In each, constitutional issues were raised applicable to Sections 18.1-227, *et seq.*, the Virginia obscenity statutes; in each, constitutionality was

upheld; in each, the pre-*Miller* test was applied; the Court reviewed evidence in considerable detail, clarified acceptable and unacceptable pleading and practice procedures and rulings under the very statutes now in question, including (1) burden of proof; (2) appropriate jury instructions in a criminal obscenity proceeding; (3) evidentiary rules regarding contemporary community standards; (4) impropriety of assumption that jurors in themselves necessarily reflect community standards; (5) applicability of "girlie-type" magazines to obscenity laws; (6) lack of jury trial provision under Section 18.1-236.3; (7) temporary restraining order as a prior restraint; (8) local vs. national "community standard"; (9) definiteness of procedures under Section 18.1-236.3; (10) admissibility, but not requirement, of expert witnesses; (11) value of lay witnesses familiar with contemporary local community standards; (12) need for some cross-section of community to be represented by witnesses; (13) relevancy of testimony regarding *other* books, films, etc.; (14) appropriateness of rejection of expert testimony; (15) specific sexual conduct as violating community standards; (16) constitutional issue as being mixed question of law and fact; (17) view of film by appellate court; (18) description of scenes in film; (19) advertising of film; (20) effect of barring juveniles from viewing; (21) effect of preventing unconsenting adults from viewing film; and (22) scienter as an element in prosecution.

The twenty-two references enumerated above do *not* constitute all rulings of the Virginia Supreme Court in the recent obscenity cases. But they surely indicate the Virginia obscenity statutes have been "authoritatively construed." These decisions serve to guide police, prosecutors, defense counsel, purveyors of questionable materials and outright filth as to the meaning and application of Virginia obscenity laws. Surely these decisions have told film exhibitors the types of films to avoid in Virginia. The factual situations coupled with affirmance or reversal constitute the rule of each case. To say that *Miller* renders these decisions worthless is something this court is not willing to do.

Respondent contends Virginia obscenity statutes must be revised as per *Miller*. Whether the General

Assembly sees fit to modify the pertinent sections in 1974 or thereafter is clearly, of purely legislative concern.

5. According to respondent, there has been a rush by various courts to declare State obscenity laws unconstitutional since *Miller.* In Appendix A to his "Supplemental Reply Memorandum" he cites eleven such cases. Only one State court of last resort is cited. On the other hand, appellate courts in the States of Washington, Massachusetts and California have upheld comparable obscenity statutes. See *State* v. *J-R Distributors,* 512 P.2d 1049 (Wash. 1973); *Commonwealth* v. *Claflin,* 298 N.E.2d 888 (Mass. 1973); *People* v. *Enskat,* 109 Cal.Rptr. 433 (1973); cf. *Rhodes* v. *State,* decided by the Florida Supreme Court on September 19, 1973 [283 So.2d 351].

6. Section 18.1-236.3 violates constitutional prohibitions against separation of powers, delegation of legislative power, denial of equal protection of the laws, and due process of law. This argument is based upon the wording of sub-sections (7) and (10) wherein the court is authorized to except from its ruling classes of persons to whom the book or film is not obscene.

Assuming, arguendo the unconstitutionality of the exemption, *House* v. *Commonwealth, supra,* answers this contention in toto. " . . . an act may be valid in one part and invalid in another, and, if the invalid is severable from the remainder, the invalid part may be ignored, provided the remaining portions are sufficient to accomplish the purpose and effect of the legislative intent." See also, *Hannabass* v. *Maryland Casualty Co.,* 169 Va. 559 (1938), and cases there cited. In this court's view, the exception provisions of Section 18.1-236.3(7) and (10) are severable from the remainder of a constitutionally valid statute. Also, the court recalls no claim by respondent that a particular group of persons should be excepted; indeed, respondent's contention is that the film is not obscene, period.

*The Merits*

A description of the film's contents is approached with great reluctance. The film itself was introduced as an exhibit, and the testimony of Detective M. K.

Liles, Jr. described each scene in detail. This court has, as stated, viewed it from beginning to end. In the court's view, it is a case of "you gotta' see it to believe it," as a current television commercial advises; not in a classic sense, but to believe such matters are publicly exhibited. Some description is, regrettably, necessary.

Opening scenes of approximately sixteen minutes involve no sexual activity. The next fifty-four minutes are almost exclusively actual sexual conduct. There are some seven or eight scenes whose only relations to one another are indeed the sexual activity as performed by naked males and females in varying numbers up to three, aided only in one scene by grapes, a banana, and a snake. Cameras appear to have been aimed almost exclusively at the genitalia. There is female masturbation, vaginal and anal intercourse involving a male and a female, and involving two males and a female concurrently; fellatio (three scenes); lesbianism; ejaculation of semen into the faces and mouths of the female participant (twice); other scenes of explicit sexual activity more or less sordid need not be mentioned here.

The first sixteen minutes depict a virgin who commits suicide, goes to hell and there manages a short reprieve. A final scene shows her doomed to eternity with an impotent male. In between, the seventy to seventy-five percent of its length is a sex marathon.

The Commonwealth offered seven witnesses: Detective Liles, a bricklayer, a child psychiatrist, a salesman active in PTA work, a housewife, a stockbroker, and a self-employed auto parts supplier. Each testified he had viewed the movie and discussed it, variously with neighbors, friends, business and laboring associates, civic organizations and their members, students, etc. They represented a limited cross-section of the Richmond community, and collectively it appeared their "roots" are in Richmond. Each appeared sufficiently familiar with community standards in Richmond, and without exception, their evidence showed the film was below such standards and appealed to the prurient interest when taken as a whole. Collectively, they had counseled, lectured and/or discussed pornography with a minimum of 2,000 area people within the past three

years, and subject movie specifically with a lesser, but substantial number of Richmond citizens within recent months.

Respondent called nine witnesses, these being a psychologist, an English literature professor, a painting teacher, an associate professor of anthropology, a film critic, a speech teacher, a nuclear physicist whose present position is in education, the manager of the Biograph Theatre and the vice-president of a local theater chain. Seven of these witnesses live or work in Richmond's Fan District. Five are associated with Virginia Commonwealth University. All testified they had seen the movie and were not offended. They felt it would not appeal to anyone's prurient interest in the Fan or in Richmond, although none testified about familiarity with contemporary community standards. They found educational, artistic, literary, entertainment and moral value. Only one or two of the seven who are not in the movie exhibition business was shown to have had a Richmond residence or occupation more than five years.

Expert testimony in obscenity cases is admissible but not required. *Price* v. *Commonwealth*, *supra.* In *Paris Adult Theatre I* v. *Slayton*, 413 U.S. 49, decided the same day as *Miller*, the United States Supreme Court held that it was not error to fail to require expert affirmative evidence that the materials were obscene when the materials themselves were actually placed in evidence. The court stated that the films there involved were obviously the best evidence of what they represent and that in its decisions since *Roth*, it had regarded the materials as sufficient in themselves for the determination of the question. Finally, the United States Supreme Court said: "This is not a subject that leads itself to the traditional use of expert testimony. Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand. No such assistance is needed by jurors in obscenity cases; indeed, the expert witness practices employed in these cases have often made a mockery out of the otherwise sound concept of expert testimony. ". . . Simply stated, hard core pornography . . . can and does speak for itself." *Paris*, *supra*, and cases there

cited. The reference to expert assistance for jurors surely applies to a court as trier of fact.

Respondent's expert witnesses were unpersuasive. Although quite well-educated, they paled in comparison with petitioner's witnesses insofar as familiarity with Richmond standards are concerned. If there are moral values in "The Devil in Miss Jones," then no movie could ever be obscene, no matter the sexual gymnastics, provided a "moral message" were shown before or after the aforesaid gymnastics. The dominant, over-whelming theme, is to appeal to prurience in sex. It is hard core pornography. One of respondent's witnesses admitted he agreed with movie critics who consider this film "the best hard core pornographic film." The only "actors" are "animated phalluses and vulvae," as another trial court in another state observed while ruling unfavorably on another film, coincidentally directed by the same man who directed "The Devil in Miss Jones."

As to educational and entertainment values, two examples may serve to answer. Presumably the Romans of the first century derived entertainment from witnessing Christians being devoured by lions. Given the right audience, any depraved spectacle may provide entertainment, even educational value. The sorry plight of one threatening to leap from a ten-story building is known to attract scores of persons.

The artistic value attributed by respondent witnesses seemingly refers to use of close-ups, filters, diffusing apparatus, etc., in the filming process. The camera angles, emphasis and close-ups thus contribute to making this film, as stated, "the best hard core pornography film" yet made.

No matter which test is applied, this film is obscene. As the Virginia Supreme Court followed the *Roth* test and acquiesced in *Memoirs*, so will it be expected to rely upon *Miller*. Therefore, this trier of fact should make it clear he finds (a) the average person, applying contemporary community (Richmond) standards, would find that the work, taken as a whole, appeals to the prurient interest; (b) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable Virginia law; and (c) the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

Were *Miller* held to apply prospectively only, this court would have no difficulty whatever adding that the work is utterly without redeeming social values.

Section 18.1-236.3(9) requires written findings on evidence offered pursuant to sub-section (7). It is believed most of these have been covered, but a few more considerations may be in order.

Respondent claims, apparently, a considerable degree of public acceptance in Richmond, in that total attendance reached 13,000. A partial answer may be to refer again to crowds who witnessed the "game" of Christians vs. Lions. Also, the attendance figure could not and did not resolve the number of repeaters, or if, for example, the great bulk of patrons were neighborhood residents. Admittedly, large crowds attended, so it should be concluded there was a considerable acceptance, whether "public" in a true sense or not. Thus, it is argued, the people of Richmond want it and should have it.

The fact of governmental regulation, though much protested by First Amendment absolutists, is undeniable. Examples cited in *Miller* and *Paris* include (1) civilized people do not allow unlimited access to heroin because it is a derivative of medicinal morphine, (2) anti-trust laws, (3) "blue sky" laws, (4) garbage and sewage disposal.

Regulation by the States in obscenity matters has long been recognized. There is the "right of the Nation and of the States to maintain a decent society . . . " *Jacobellis* v. *Ohio*, 378 U.S. 184, 199 (1964), a dissenting opinion now frequently quoted by the United States Supreme Court and the Virginia Supreme Court. "The States have the power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material, has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize the 'right . . . to maintain a decent society' . . . " *Paris, supra.*

Evidence was offered by respondent that the film's director has a "very fine reputation among exhibitors; that he will make a very important film some day." His sole intent was hard core pornography, for cash. The reference earlier to another movie he directed, ("Deep Throat"), tells much of his reputation. No evidence indicates he is known for anything

save the filming of "demeaning and perverted sexual activities, insulting it (sex), without tenderness or understanding." (Taken from language in *People* v. *Mature Enterprises, Inc.*, New York City Criminal Court, March 1, 1973).

This court's judgment, concurring with witnesses for the petitioner, is based, in addition to viewing the film, upon forty-five years residence in Richmond less three years away, and a reasonably fair familiarity with contemporary community standards. The activities depicted in "The Devil in Miss Jones" are, to use the plainest language at hand, low-down, common, trash.